LisaMarie Collins
Mintz, Levin, Cohn, Ferris, Glovsky
 and Popeo, P.C.
666 Third Avenue
New York, NY  10017
Telephone:  212-935-3000
Email:  LCollins@mintz.com

**UNITED STATES FEDERAL COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
WIRELESS EVERYWHERE, LLC                  :
                                          :
                         Plaintiff        :   Case No.:
                                          :
            v.                            :   **COMPLAINT**
                                          :
Imran Hassan,                             :   **Jury Trial Requested**
                                          :
                         Defendant.       :
-------------------------------------------------------------x
```

## NATURE OF THE ACTION

1. Defendant Imran Hassan ("Defendant") is a former employee of plaintiff Wireless Everywhere, LLC ("Plaintiff" or "Wireless Everywhere").  This case arises from Defendant's faithless and fraudulent conduct while employed by Plaintiff, including taking thousands of dollars in kickback payments from third-party vendors engaged by Plaintiff.  Defendant lined his pockets with these kickback payments for his personal use, benefit, and enjoyment, all while employed in an executive role by Plaintiff, holding an ownership stake in Wireless Everywhere, and earning a generous salary.

2. Additionally, Defendant breached common law and contractual duties of loyalty owing to Plaintiff.  Defendant expressly agreed that he would not, without express permission from Plaintiff, hold other employment or engage in any business activity that competed or

conflicted with the business of Wireless Everywhere while he was employed by Wireless Everywhere.

3. Despite this agreed upon fiduciary obligation, Defendant secretly maintained employment with a direct competitor of Plaintiff for the duration of Defendant's employment with Plaintiff. Defendant's disloyalty is particularly harmful given that Defendant had nearly unfettered access to Plaintiff's trade secrets, customer information, business strategy, financials, and other confidential information during the course of his employment with Plaintiff.

4. In further breach of his fiduciary duties, Defendant kept secret that he owned and operated a company called RF Connectivity Solutions LLC ("RF Connectivity"). RF Connectivity provides wireless network design services. As explained in detail below, Defendant's owning and operating RF Connectivity during his employment conflicted with the business of Plaintiff and Defendant's common law and contractual obligations to Plaintiff.

5. Defendant fraudulently induced Plaintiff to enter into a service contract with RF Connectivity without disclosing his ownership in RF Connectivity. Had Plaintiff known that RF Connectivity was owned and operated by Defendant, Plaintiff would never have engaged RF Connectivity. Upon information and belief, Defendant, vis à vis RF Connectivity, charged Plaintiff inflated rates for service and pocketed the fees paid by Plaintiff for services rendered by employees of RF Connectivity.

6. This action seeks to recover damages, including but not limited to all cash and equity compensation paid to Defendant during his employment with Plaintiff, disgorge ill-gotten gains, impose punitive damages, and otherwise compensate Plaintiff for Defendant's outrageous and unlawful conduct.

## PARTIES

7. Plaintiff is Wireless Everywhere, LLC d/b/a Wireless Everywhere Networks is a Delaware limited liability company with its principal place of business located in Washington D.C.

8. Defendant Imran Hassan is a citizen of the State of New York.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000 (exclusive of interest and costs).

10. This Court has personal jurisdiction over Defendant because he is domiciled in New York.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(b)(2).

## STATEMENT OF FACTS

**Plaintiff Hires Defendant Imran Hassan**

12. Plaintiff Wireless Everywhere was founded in 2016 and is a leading wireless infrastructure provider that designs, builds and manages indoor wireless networks. Wireless Everywhere also builds public safety networks that support emergency first responders throughout the country and has extensive experience working with municipalities to ensure these mandated networks are compliant with federal, state and local code. Additionally, Wireless Everywhere designs and builds indoor cellular networks used by major carriers and works closely with carriers to coordinate and deploy essential mobile services.

13. Wireless Everywhere began as a four person start-up venture. Wireless Everywhere has experienced rapid growth since its inception, attributable to its in-demand cutting

3

edge technology and profound commitment to client service. Today, Wireless Everywhere employees 24 full-time employees.

14. Approximately six months after Wireless Everywhere was founded, Defendant was hired as Wireless Everywhere's Director - DAS/Small Cell Engineering. Defendant was the fifth employee to join Wireless Everywhere on July 18, 2016 and Wireless Everywhere's first and only Director of Engineering. As a Director, Defendant held a senior position at Wireless Everywhere and was a part of Wireless Everywhere's core leadership team.

15. Defendant was responsible for, *inter alia*, spearheading and directing all engineering related design work for each of Wireless Everywhere's customers. Defendant was also responsible sourcing third-party vendors to provide network design services and managing and overseeing these third-party vendors.

16. As a Director, Defendant was given access to Plaintiff's confidential information and trade secrets. Accordingly, when Defendant joined Wireless Everywhere he entered into an Employee Proprietary Information, Inventions, Non-Solicitation and Non-Competition Agreement (the "PIINN Agreement"). Per the PIINN Agreement, Defendant agreed to abide robust contractual obligations of confidentiality with respect to Wireless Everywhere's inventions, trade secrets, proprietary information, confidential information and other work product.

17. Additionally, pursuant to Section 4 of the PIINN, Defendant expressly agreed to abide duties of loyalty during his employment. Specifically, Defendant agreed that,

> [D]uring the period of my employment by the Company **I will not, without the Company's express written consent, directly or indirectly engage in any employment or business activity which is directly or indirectly competitive with, or would otherwise conflict with, my employment by the Company.** (Emphasis added).

18. Pursuant to Section 10.2 of the PIINN Agreement, Defendant also agreed that if Plaintiff was successful in "any legal or equitable action against [Defendant] under [the PIINN Agreement], *[Plaintiff] will be entitled to payment of all costs, including reasonable attorney's fees, from [Defendant]*. (Emphasis added).

19. Upon joining Wireless Everywhere, Defendant was awarded an option to purchase 400,000 Common Units of the Company's restricted units (the "Stock Award"). 400,000 Common Units represents approximately 3.74% ownership interest in the Company.

20. Over the course of Defendant's employment with Plaintiff, he was paid more than $419,805 in salary and discretionary bonuses.

**While Employed by Plaintiff, Defendant Begins Taking Kickback Payments from a Vendor Engaged by Plaintiff**

21. In or around February of 2016, Plaintiff engaged a third party vendor located in India ("Vendor No. 1") to assist in providing wireless network design services to Plaintiff's customers.

22. Between February of 2016 and January of 2018, Plaintiff paid Vendor No. 1 on a per-project basis.

23. Defendant became employed by Plaintiff approximately fourth months after Plaintiff engaged Vendor No. 1. Upon joining Plaintiff, Defendant took over responsibility for managing Vendor No. 1, being the primary point of contact and overseeing deliverables.

24. In January of 2017, Vendor No. 1 significantly increased its rates. As a result, the Plaintiff considered terminating the relationship with Vendor No. 1. Defendant advised and urged Plaintiff that the rate increase was reasonable and should be accepted.

25. In December of 2017, Vendor No. 1 again sought to increase its rates and change its rate structure. Rather than being compensated on a per project basis, Vendor No. 1 demanded

5

to be paid a monthly flat fee. By this time, Plaintiff made Defendant aware that it was unhappy with the quality of service being provided by Vendor No. 1 and Vendor No. 1's inconsistent and unprofessional pricing practices, and considered terminating the relationship. Defendant again advised Plaintiff that the rate increases and monthly fee structure demanded by Vendor No. 1 were reasonable and that Plaintiff should continue its relationship with Vendor No. 1.

26. Relying on Defendant's recommendation, Plaintiff entered into a new agreement with Vendor No. 1, pursuant to which Plaintiff agreed to pay Vendor No. 1 a flat fee of $10,500 per month for January and February of 2018, $11,500 per month for March and April 2018, and $13,000 per month from May to December 2018.

27. By September of 2018, the performance of Vendor No. 1 had deteriorated. As a result, Plaintiff terminated the contract with Vendor No. 1 on September 5, 2018.

**Plaintiff Learns that Defendant Has Been Taking Kickback Payments from Vendor No. 1**

28. In August 2020, Plaintiff discovered that beginning in or around September 2017, Defendant began taking kickback payments in the amount of at least $2,300 per month from Vendor No. 1. Upon information and belief, Defendant required Vendor No. 1 to pay a portion of the fees received from Plaintiff for services rendered directly to the personal bank account of Defendant (the "First Kickback Scheme").

29. Upon information and belief, in late 2017, Defendant directed the founder and CEO of Vendor No. 1 to propose to Plaintiff that Plaintiff pay Vendor No. 1 a monthly fee rather than being compensated on a per project basis. Defendant advised the founder and CEO of Vendor No. 1 that Defendant would advise Plaintiff to pay Vendor No. 1 a monthly flat fee instead of remitting payment for services rendered on a per project basis. A monthly flat fee payment arrangement was more lucrative for Vendor No. 1 and guaranteed a steady stream of income.

30. In or around late December of 2017, the founder and CEO of Vendor No. 1 informed Plaintiff that it would no longer accept payment on a per-project basis. Rather, the founder and CEO of Vendor No. 1 proposed that Plaintiff pay Vendor No. 1 a monthly flat fee. The CEO and Founder of Vendor No. 1 informed Plaintiff that Vendor No. 1 would not continue its relationship with Plaintiff if Plaintiff did not agree to a monthly flat fee payment arrangement.

31. Upon information and belief, Vendor No. 1 was enticed by Defendant's offer as it was a new company with an inconsistent and unpredictable flow of work. In exchange, Vendor No. 1 was required to make monthly kickback payments of approximately $2,300 per month directly to Defendant's personal bank account from the funds paid by Plaintiff to Vendor No. 1.

32. Upon information and belief, Defendant threatened Vendor No. 1 that if it did not agree to make kickback payments to Defendant, Defendant would cause Plaintiff to terminate its relationship with Vendor No. 1.

33. Between September of 2017 and August of 2018, Plaintiff paid Vendor No. 1 a total of $139,730 in fees.

34. Upon information and belief, Defendant received, to his personal bank account, at least $19,670 in kickback payments from Vendor No. 1 between September 2017 and August 2018, while employed by Plaintiff.

35. Certain of the facts relating to the First Kickback Scheme described herein remain concealed from Plaintiff and peculiarly within the knowledge of Defendant. Plaintiff's investigation into the First Kickback Scheme is continuing.

**Defendant Takes Kickback Payments from a Second Vendor Engaged by Plaintiff**

36. In or around the early Fall of 2018, Defendant recommended a company based in Pakistan ("Vendor No. 2") to replace Vendor No. 1. Defendant introduced Plaintiff to an individual who was the account manager and point of contact at Vendor No. 2. Upon information

and belief, the account manager at Vendor No. 2 that serviced the Company's account is Defendant's biological brother. Defendant did not disclose to Plaintiff that the account manager at Vendor No. 2 is his brother.

37. Plaintiff entered into a series of services contract with Vendor No. 2 between September 2018 and September 2019, whereby Plaintiff agreed to pay Vendor No. 2 monthly flat fees ranging from $12,000 to $19,500 through August 2020.

38. Defendant negotiated all services contracts with Vendor No. 2, was the primary point of contact on behalf of Plaintiff with Vendor No. 2, and was responsible for managing Vendor No. 2 and overseeing its deliverables.

**Plaintiff Discovers that Defendant Is Taking Kickback Payments from Vendor No. 2**

39. In August of 2020 Plaintiff discovered that Defendant was taking kickback payments from Vendor No. 2 while he was employed by Plaintiff. Defendant took kickback payments from Vendor No. 2 from each of the monthly payments that Plaintiff remitted to Vendor No. 2 for services rendered (the "Second Kickback Scheme").

40. Upon information and belief, Defendant induced Plaintiff to enter into a contractual relationship with Vendor No. 2 so that Defendant, with the assistance of his brother, could perpetrate the Second Kickback Scheme.

41. Between September of 2018 and July of 2020, Plaintiff paid Vendor No. 2 approximately $364,600.

42. Upon information and belief, Vendor No. 2 benefitted from only $5,000 per month of the fees paid by Plaintiff to Vendor No. 2.

43. Plaintiff estimates that Defendant has unlawfully collected at least $215,000 in of kickback payments under the Second Kickback Scheme.

44. Certain of the facts relating to the Second Kickback Scheme described herein remain concealed from Plaintiff and peculiarly within the knowledge of Defendant. Plaintiff's investigation into the Second Kickback Scheme is continuing.

**Defendant Breaches His Duty of Loyalty By Operating a Business in Conflict with his Employment by Plaintiff and Fraudulently Inducing Plaintiff to Enter Into a Services Contract with Defendant's Conflicting Business**

45. In May of 2020, Defendant's brother sent an email to Plaintiff, with a cc: to Defendant, advising that Vendor No. 2 was "restructuring and rebranding." Defendant's brother represented that, as a result of the alleged "restructuring," Vendor No. 2 would be replaced by a company called RF Connectivity.

46. Defendant encouraged and persuaded Plaintiff to enter into a services contract with RF Connectivity. Plaintiff entered into an agreement with RF Connectivity in June of 2020. Plaintiff agreed to pay RF Connectivity $17,000 per month for wireless network design services. Defendant was directly and solely responsible for negotiating the contract with RF Connectivity on behalf of Plaintiff.

47. In August of 2020, Plaintiff discovered that RF Connectivity is owned and operated by Defendant. In fact, RF Connectivity is registered with the New York State Department of State and the address for the company is Defendant's former home address.

48. At no point in time did Defendant disclose to Plaintiff that he owns and operates RF Connectivity.

49. Had Plaintiff known that RF Connectivity was owned and operated by Defendant, Plaintiff would never have engaged RF Connectivity. Upon information and belief, Defendant, vis à vis RF Connectivity, charged Plaintiff inflated rates for service and pocketed the fees paid by Plaintiff for services rendered by employees of RF Connectivity.

50. Defendant fraudulently induced Plaintiff to enter into a services contract with RF Connectivity.

51. Moreover, Defendant did not request or receive Plaintiff's permission to own and operate RF Connectivity while employed by Plaintiff, as required by the PIINN Agreement.

52. Defendant's ownership of RF Connectivity without Plaintiff's permission constitutes a breach of Defendant's duty of loyalty as required by the PIINN Agreement because owning and operating RF Connectivity conflicted with and infringed upon Defendant's obligations to Plaintiff as an employee of Wireless Everywhere.

53. Moreover, upon information and belief, Defendant has and continues to unlawfully utilize Plaintiff's trade secrets, business strategy, customer information and other confidential information for the benefit of RF Connectivity and to Plaintiff's detriment.

54. As a result of the foregoing, Plaintiff has incurred damages to an extent not yet ascertained.

**Defendant Is Employed By a Competitor While Employed by the Company, Breaching His Contractual Duty of Loyalty to the Company**

55. In or around August of 2020, Plaintiff discovered that for the duration of Defendant's employment with Plaintiff, Defendant was concurrently employed as a full-time employee, by Advanced Network Services, LLC ("ANS"), a direct competitor of Plaintiff. ANS confirmed Defendant's employment in a letter dated October 8, 2020.

56. Like Plaintiff, ANS "offers to its customers are In-Building Wireless, Tower Services, Network Infrastructure, and DC Power Systems." Plaintiff and ANS provide, among other wireless related services, in-building wireless network services, to an identical customer base, including apartment buildings and hotels.

57. Upon information and belief, Defendant's role at ANS was nearly identical to his role with Plaintiff. At ANS, Defendant was responsible for spearheading and directing all engineering related design work for ANS's customers and was also responsible for sourcing third-party vendors and for managing and overseeing such third-party vendors.

58. Upon information and belief, during Defendant's employment with ANS, Defendant misappropriated and disclosed to ANS Plaintiff's trade secrets and other highly confidential information. In fact, Plaintiff made its concerns known to Defendant on multiple occasions regarding ANS' suspiciously similar service offerings and technology. For example, in May 2020, Plaintiff emailed Defendant regarding ANS' marketing of a "temperature detection solution" and expressed concern that it chronologically mirrored Plaintiff's internal research and development efforts.

59. Defendant misappropriated and disclosed Plaintiff's trade secrets and other confidential information to ANS with an intent to injure Plaintiff, and with the intent to benefit himself.

60. As a result of the foregoing, Plaintiff has incurred damages to an extent not yet ascertained.

## CAUSES OF ACTION

### COUNT I: BREACH OF FIDUCIARY DUTY – FAITHLESS SERVANT DOCTRINE

61. The Plaintiff repeats paragraphs 1 through 60 as if fully set forth herein.

62. Defendant, as an employee of Plaintiff, owed common law fiduciary duties to Plaintiff. As part of his fiduciary duties to Plaintiff, Defendant was prohibited from acting in any manner inconsistent with his agency or trust with Plaintiff and was, at all times, bound to exercise the utmost good faith and loyalty in the performance of his duties.

63. Beginning in or around September of 2017 through at least June of 2020, Defendant took kickback payments from at least two vendors engaged by Plaintiff, thereby breaching his fiduciary duty of loyalty to Plaintiff. Upon information and belief, Defendant collected at least $234,670 in kickback payments from vendors engaged by Plaintiff.

64. From the first day of Defendant's employment with Plaintiff until at least April 3, 2020, Defendant was simultaneously employed by ANS, a direct competitor of Plaintiff. Defendant did not disclose to Plaintiff that he was simultaneously employed by a direct competitor of Plaintiff. Nor did Plaintiff request permission to maintain employment with a competitor of Plaintiff while employed by Plaintiff. Defendant's conduct breached Defendant's duty of loyalty to Plaintiff as set forth in the PIINN Agreement.

65. Upon information and belief, Defendant disclosed Plaintiff's trade secrets, business strategy and other confidential information to his other employer.

66. From a date currently unknown, but at least as early as June 2020, Defendant owned and operated a business called RF Connectivity that directly conflicted with Defendant's obligations to the business of Plaintiff, while Defendant was employed by Plaintiff.

67. Defendant's ownership and operation of RF Connectivity during his employment with Plaintiff constitutes a breach of his contractual duty of loyalty to Plaintiff as set forth in the PIINN Agreement.

68. Upon information and belief, Defendant has and may continue to unlawfully utilize Plaintiff's trade secrets, business strategy, customer information and other confidential information in connection with RF Connectivity.

69. Defendant has been a continuously faithless servant throughout his employment with Plaintiff.

70. Plaintiff is entitled to and seeks recovery of all compensation paid to Defendant during the term of his employment, in an amount to be determined at trial, but not less, than the total of all salary and bonus payments paid to Defendant for the duration of his employment with Plaintiff.

71. Plaintiff is entitled to and seeks recovery of the entirety of the Stock Award awarded to Defendant by Plaintiff.

72. Upon information and belief, Defendant collected unlawful kickback payments of at least $234,670.

73. Plaintiff is entitled to and seeks recovery of the total amount of all kickback payments collected by Defendant or his agents or anyone while he was employed by Plaintiff.

74. Plaintiff is entitled to and seeks punitive damages in an amount to be determined at trial.

75. Plaintiff is entitled to and seeks recovery for all attorneys' fees, filing fees, costs of suit and other related expenses.

## COUNT II:  BREACH OF DUTY OF LOYALTY

76. The Plaintiff repeats paragraphs 1 through 75 as if fully set forth herein.

77. Defendant, as an employee of Plaintiff, owed common law fiduciary duties to Plaintiff.  As part of his fiduciary duties to Plaintiff, Defendant was prohibited from acting in any manner inconsistent with his agency or trust with Plaintiff and was, at all times, bound to exercise the utmost good faith and loyalty in the performance of his duties.

78. Beginning in or around September of 2017 through at least June of 2020, Defendant took kickback payments from at least two vendors engaged by Plaintiff, thereby breaching his

fiduciary duty of loyalty to Plaintiff. Upon information and belief, Defendant collected at least $234,670 in kickback payments from vendors engaged by Plaintiff.

79. From the first day of Defendant's employment with Plaintiff until at least April 3, 2020, Defendant was simultaneously employed by a direct competitor of Plaintiff. Defendant did not disclose to Plaintiff that he was simultaneously employed by a direct competitor of Plaintiff. Nor did Plaintiff request permission to maintain employment with a competitor of Plaintiff while employed by Plaintiff. Defendant's conduct breached Defendant's duty of loyalty to Plaintiff as set forth in the PIINN Agreement.

80. Upon information and belief, Defendant disclosed Plaintiff's trade secrets, business strategy, customer information and other confidential information to his other employer. Defendants conduct caused irreparable harm to Plaintiff.

81. From a date currently unknown, but at least as early as June 2020, Defendant owned and operated a business called RF Connectivity that was in direct conflict with Defendant's duties to Plaintiff while Defendant was employed by Plaintiff.

82. Defendant's ownership and operation of RF Connectivity during his employment with Plaintiff constitutes a breach of his contractual duty of loyalty to Plaintiff as set forth in the PIINN Agreement.

83. Upon information and belief, Defendant has and may continue to unlawfully utilize Plaintiff's trade secrets, business strategy, customer information and other confidential information in connection with RF Connectivity. Defendant's conduct has caused irreparable harm to Plaintiff.

84. By reason of the foregoing, the Plaintiff is entitled to an award of compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that that this Court enter judgment against the Defendant as follows:

a) on Plaintiff's First Count, require that Defendant Imran Hassan: (i) forfeit the entirety of 400,000 common unit Stock Award, including vested and unvested common units; (ii) disgorge to Plaintiff all salary and bonus payments paid to Defendant Imran Hassan from September 1, 2017 until the termination of his employment on August 28, 2020; reimburse Plaintiff for all funds improperly obtained from Vendor No. 1, Vendor No. 2 and RF Connectivity Solutions, LLC;

b) on Plaintiff's First Count, awarding compensatory damages against Defendant Imran Hassan in an amount to be determined at the trial of this action, together with interest at the statutory rate, plus punitive damages against Defendant Imran Hassan in an amount to be determined at trial;

c) on Plaintiff's Second Count, awarding compensatory damages against Defendant Imran Hassan in an amount to be determined at the trial of this action, together with interest at the statutory rate, plus punitive damages against Imran Hassan in an amount to be determined at trial;

d) attorney's fees, costs and expenses;

e) all other relief this Court deems just and proper.

Dated: New York, New York
February 25, 2021

**MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.**

By: /s/ LisaMarie Collins
    LisaMarie Collins
The Chrysler Center
666 Third Avenue
New York, New York 10017
Telephone:(212)935-3000
Email:  lfcollins@mintz.com

*Attorneys for Plaintiff Wireless Everywhere, LLC*